Emir Phillips
806 Chancery Lane
Cave Springs, AR 72718
310-930-6360
emirphil@yahoo.com

IN PRO PER

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

JEFFERSON CITY - CENTRAL DIVISION

| | |
|---|---|
| DR. EMIR PHILLIPS<br><br>PLAINTIFF<br><br><br>STATE OF MISSOURI;<br>BOARD OF CURATORS OF LINCOLN UNIVERSITY;<br>DR. JOHN MOSELEY, in his official and individual capacities;<br>DR. STEVIE LAWRENCE, in his official and individual capacities;<br>DR. DENEIA THOMAS, in her official and individual capacities;<br>and DOES 1 through 20, inclusive, Defendants..<br><br>**DEFENDANTS** | Case Number:<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR FISCAL IRRESPONSIBLITY AT AN HBCU (Violations of the Second Morrill Act, 7 U.S.C. § 322 et seq.; 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964; and Related Missouri Constitutional and Statutory Law)**<br><br><br>Date:<br>Time:<br>Dept.: |

Emir Phillips,
PLAINTIFF, IN PRO PER

1

# I. INTRODUCTION

Comes now Plaintiff **Dr. Emir Phillips**, a Professor of Finance at **Lincoln University**, a federally designated 1890 land-grant institution located in Jefferson City, Missouri, and states as follows:

This Complaint arises from **systemic fiscal mismanagement, administrative negligence, and dereliction of statutory duty** by Lincoln University and the State of Missouri, resulting in the **forfeiture or failure to secure up to $4–5 million annually** in federal land-grant appropriations to which Lincoln University is lawfully entitled under the **Second Morrill Act of 1890** (7 U.S.C. § 322 et seq.). This funding is contingent upon a statutory **dollar-for-dollar matching obligation** by the State of Missouri, which it has historically failed to fulfill.

As a scholar of public finance and institutional economics, Plaintiff has a unique fiduciary and constitutional interest in exposing the breadth and gravity of this funding lapse. His review of the 2024 audit, in collaboration with Professor Scott Seslar, CPA, revealed troubling fiscal irregularities and potentially unlawful suppression of internal oversight mechanisms. This complaint is supported by **the sworn affidavit of Professor Scott Seslar** (Exhibit 1), whose testimony substantiates the material allegations herein.

This matter transcends institutional politics or administrative oversight. It implicates the foundational principle that **public funds entrusted for the advancement of historically Black institutions must be stewarded with transparency, diligence, and equity**. To do otherwise is not only unlawful, but unconscionable.

Plaintiff incorporates evidence from:

- **Independent Auditor's Report and Financial Statements** (June 30, 2024 & 2023)
- **MOSERS Pension Disclosures and Ratios**
- **Schedule of Expenditures of Federal Awards**
- **Faculty Senate Budget Presentation (Feb 2025)**
- **Request for Full Financial Access (March 2025)**
- **Audit Request to Missouri State Auditor (March 2025)**

Together, these sources reveal:

- A $1.1 million state matching **shortfall for FY 2024** in violation of the **Second Morrill Act**, impacting $11.2 million in USDA funding.

- A 313.92% pension liability-to-payroll ratio, pointing to long-term **fiscal mismanagement** under **RSMo Chapter 104**.
- Escalating reliance on nontransparent contractual services and outsized administrative costs amidst stagnant enrollment.
- A governance culture that obstructs transparency, violates the Missouri Sunshine Law, and silences faculty oversight.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to:

- 28 U.S.C. § 1331 (federal question);
- 28 U.S.C. § 1343 (civil rights enforcement);
- 42 U.S.C. § 1983 (constitutional violations);
- 28 U.S.C. § 2201 (declaratory relief).

Venue is proper under 28 U.S.C. § 1391(b) as all acts and omissions occurred within the Western District of Missouri.

## III. PLAINTIFF'S STANDING

Dr. Emir Phillips has standing as:

- A faculty member whose professional obligations include fiscal accountability and teaching public budgeting;
- A participant in the internal audit review process that uncovered material financial discrepancies;
- An academic affected by the underfunding of programs, grants, and salaries directly tied to land-grant resources;
- A citizen-taxpayer whose rights to due process and institutional transparency have been disregarded.
- A faculty member involved in governance as mandated by **Missouri Revised Statutes §§ 173.005, 173.1102**

Plaintiff's rights under the **First and Fourteenth Amendments**, as well as **Title VI of the Civil Rights Act**, are squarely implicated.

## IV. FACTUAL BACKGROUND

1. Lincoln University is a historically Black public land-grant university established under the Second Morrill Act of 1890.

3

2. Under 7 U.S.C. § 323, the State of Missouri is required to provide **matching state funds** for every dollar of federal appropriation. Under 7 U.S.C. § 323, the State of Missouri is required to provide a dollar-for-dollar state match for every federal land-grant appropriation allocated to Lincoln. Yet for FY 2024, Missouri appropriated only $10.1 million to support $11.2 million in federal funding—resulting in a **$1.1 million shortfall** that rendered Lincoln ineligible for full federal funding and directly impaired academic operations, faculty support, and grant eligibility.

3. The USDA's National Institute of Food and Agriculture (NIFA) administers these appropriations.

4. Lincoln University routinely **fails to apply for or utilize its full federal allocation**, due to either negligent administrative oversight or willful institutional sabotage.

5. According to the **sworn affidavit of Professor Scott Seslar, CPA (Exhibit A)**:

   o CFO Jeff Barlow disclosed to Prof. Seslar that Lincoln **missed out on $4–5 million in grants**.

   o Prof. Seslar and Plaintiff reviewed the 2024 audit and discovered **significant financial irregularities**.

   o Mr. Barlow resigned suddenly within 48 hours of a faculty presentation, raising serious red flags about potential pressure or retaliation.

   o Prof. Seslar was sabotaged in his attempt to present this information to the Faculty Senate.

6. This systemic negligence directly contradicts the standards of financial stewardship required by:

   o The **Second Morrill Act (7 U.S.C. § 322 et seq.)**;

   o The **Uniform Grant Guidance (2 C.F.R. § 200 et seq.)**;

   o **Missouri Revised Statutes § 173.005** (requiring institutional cooperation with state and federal mandates);

   o **Missouri Revised Statutes § 173.1102** (providing for performance-based funding metrics and oversight);

   o **Missouri Constitution, Article IX, § 9(a)** (safeguarding the independence and funding obligations of public institutions);

   o The **Higher Learning Commission's Criterion 5.C**, which mandates responsible resource management.

7. Moreover, the State of Missouri's consistent failure to match funds **disparately impacts a historically Black institution** compared to its 1862 land-grant counterpart (University of Missouri-Columbia), potentially violating **Title VI of the Civil Rights Act**.

8. **Land-Grant Negligence**: Lincoln University missed out on an estimated **$4–5 million in federal grants**, including USDA research awards and HEERF III funding. State matching under 7 U.S.C. § 323 fell short by **$1.1 million in FY 2024 alone**

4

9. **Audit Red Flags**: A 121% increase in short-term liabilities (from $3.2M to $7.1M) was discovered by Dr. Phillips and Professor Seslar. Contractual services rose despite enrollment decline, suggesting **possible procurement violations** under **2 CFR Part 200.318-320**.

10. **Governance Failure**: Repeated obstruction of faculty oversight was documented in budget presentations and a formal request by Professor Seslar to join the Board of Curators' Finance Committee

11. **Inaccessible Budget Process**: The FY 2023-25 budget timeline shows executive decisions were made without real-time budget disclosures to the Faculty Senate, violating shared governance practices recommended by the **Higher Learning Commission (HLC)**

12. **High Pension Liabilities**: The university reported a **$51.2 million pension liability**, amounting to 313.92% of covered payroll, despite increased contributions to MOSERS. This raises sustainability concerns under **GASB 75** and **RSMo Chapter 104**.

13. **Missouri Constitution Violations**: The State of Missouri, by underfunding Lincoln University, violated **Article IX, Section 9(a)** requiring adequate support for public higher education.

14. **Federal Award Mismanagement (2 CFR § 200.303)**: The University's FY 2024 Schedule of Expenditures of Federal Awards (SEFA) shows considerable allocations from USDA, Department of Education, NASA, and HHS. The rising trend in contractual services and underutilized matching capacity undermines internal control requirements for federal programs.

15. **Obstruction of Faculty Oversight (RSMo §§ 610.010–.035)**: Internal budget memos and emails document repeated refusals by administrators to grant financial access to the Faculty Senate, violating both the state's Sunshine Law and HLC accreditation standards for shared governance. **(Exhibit 3)**

16. **Dawson Hall Renovation & Bond Liabilities**: The University allocated $18 million of its fund balance and $5 million in federal grants toward the renovation of Dawson Hall—a $23 million commitment—while liabilities from revenue bonds remain nearly $15 million. No transparent cost-benefit analysis was disclosed to the Faculty Senate.

17. **Enrollment vs. Expenditures**: Full-time student enrollment declined from 1,388 in 2022 to 1,244 in 2024, yet compensation and contractual services ballooned. The latter rose from $11.0M in FY 2022 to $15.7M in FY 2024. This misalignment suggests reckless spending.

18. **Retirement and OPEB Liability (GASB 75)**: The University's total OPEB liability stood at $400,309 for FY 2024. When combined with pension liabilities, Lincoln's retiree benefit obligations threaten long-term solvency, triggering concern under both GASB 68 and 75.

5

19. Behind this chronic underfunding is a **systemic and intentional suppression of budgetary oversight**, coordinated at the highest levels of Lincoln's administration—including Provost Dr. Stevie Lawrence, Dean Dr. Deneia Thomas, and President Dr. John Moseley.

**A. The Marginalization of the University Budget Committee and Its Chair**

At the heart of the controversy is **Professor Scott Seslar, CPA**, who served as **Chair of the Faculty Senate Budget Committee**—a position formally tasked with overseeing financial planning, advising senior leadership, and ensuring regulatory compliance. His role, codified by academic tradition and university bylaws, includes:

- Budget development and review;
- Long-term financial strategy;
- Oversight of institutional resource allocation;
- Collaboration with administration and the Board of Curators;
- Regulatory compliance and reporting;
- Transparency and stakeholder communication.

In a formal memo dated January 24, 2025, addressed to Dean Deneia Thomas, Professor Seslar clearly articulated his responsibilities and protested administrative interference that **undermined his legal and fiduciary mandate**:

"I am truly struggling to find where within said parameters I am precluded, or need your permission, to help Jeff Barlow with University budgeting... If you do not grant such permission, I request an explanation of the specific legal, regulatory, or institutional basis—whether under Missouri law, federal statutes, or Lincoln University policies—that justifies such a denial."

Despite this direct and well-reasoned appeal, **administrators stalled and refused to grant him access**, even as former budget officer Ker Braun's departure left the university without adequate fiscal oversight. Provost Stevie Lawrence and Dean Thomas deferred decision-making to CFO Jeff Barlow—who in turn was told by Lawrence that approval must come from the Dean, Department Chair, Human Resources, and ultimately **President John Moseley himself**:

"Once a decision is made at that level [President Moseley], we will follow up... with the necessary internal approvals."
—Provost Lawrence, Jan. 24, 2025

This **intentionally convoluted approval chain functioned as a gatekeeping mechanism**, effectively paralyzing budget transparency in the weeks leading up to critical fiscal deadlines.

**B. Suppression of Faculty Oversight and Internal Retaliation**

Following the obstruction of Seslar's budget collaboration, a pattern of **retaliatory conduct escalated**. In February 2025, Seslar and co-complainant Dr. Emir Phillips had jointly reviewed Lincoln's 2024 financial audit, revealing a $1.1 million matching shortfall, a 121% increase in short-term liabilities, and disturbing trends in rising contractual services costs amid declining enrollment.

Seslar was scheduled to present these findings to the Faculty Senate. The night before, on February 26, Provost Lawrence emailed him with a veiled directive:

"A key element in demonstrating transparency and a united front... is speaking with one voice."
—Dr. Stevie Lawrence, Feb. 26, 2025

Within 48 hours of this message, CFO Barlow abruptly resigned, despite having previously expressed long-term career intentions. This sequence of events strongly suggests **internal retaliation and silencing of fiscal whistleblowers.**

## C. President John Moseley's Central Role

President Moseley's complicity is not theoretical—it is operational and well-documented:

- He was the **final decision-maker** on whether Seslar could continue his budget work;
- He **failed to act** on credible financial red flags raised by Seslar and Phillips, including missed grants and improper expenditures;
- He was **present** in the university cafeteria within ten feet of a key budget conversation between Seslar and Barlow—a meeting followed by administrative suppression and Barlow's resignation;
- He authorized or tolerated the **expansion of nontransparent contracts** (rising from $11M to $15.7M in two years) while enrollment and services shrank;
- He **failed to include faculty in financial governance** in violation of Missouri Revised Statutes §§ 173.005 and 173.1102, and HLC accreditation requirements.

Dr. Moseley's actions—and failure to act—constitute a **gross dereliction of fiduciary duty** and a deliberate effort to conceal financial instability from both faculty and external regulators.

20. A. Obstruction of Faculty Oversight by Dr. Deneia Thomas

As Dean of the School of Business, **Dr. Deneia Thomas** played a pivotal role in obstructing the efforts of the Faculty Senate Budget Committee, particularly those of its Chair, Professor Scott Seslar. Professor Seslar's responsibilities included collaborating with university financial officers to ensure transparent and accurate budgeting. However, Dr. Thomas imposed unnecessary bureaucratic barriers that hindered this collaboration.

In a communication dated January 23, 2025, Dr. Thomas was informed by Provost Dr. Stevie Lawrence that any compensation for Professor Seslar's assistance in budgeting required prior approvals, including from Dr. Thomas herself. This directive effectively stalled Professor Seslar's involvement, despite the urgent need for his expertise following the departure of key budgeting personnel.

7

Furthermore, when Professor Seslar sought clarification from Dr. Thomas regarding his ability to work with CFO Jeff Barlow, he emphasized his role and the lack of necessity for additional permissions. Despite this, Dr. Thomas did not facilitate his involvement, thereby contributing to the suppression of faculty oversight in financial matters.

B. Retaliatory Environment and Administrative Complicity

The actions of Dr. Thomas, in concert with President John Moseley and Provost Stevie Lawrence, fostered an environment where faculty members were discouraged from active participation in governance, particularly in areas related to financial oversight. This environment was characterized by:

- **Deliberate Delays**: Requiring multiple layers of approval for standard faculty duties, effectively hindering timely and necessary budgetary oversight.
- **Suppression of Dissent**: Discouraging faculty from presenting findings related to financial mismanagement, thereby violating principles of academic freedom and shared governance.
- **Retaliatory Actions**: Contributing to a climate where faculty feared reprisal for engaging in oversight activities, as evidenced by the abrupt resignation of CFO Barlow following his collaboration with Professor Seslar.


**Prospective Key Findings from Exhibit 6**


1. Significant Growth in Contractual Services Amid Declining Enrollment

- Contractual service expenses rose from **$11.0 million in FY 2022** to **$15.7 million in FY 2024**, a **42.7% increase** in just two years.
- Enrollment, however, **declined from 1,833 in 2023 to 1,799 in 2024**, following a long-term downward trend since 2014 (a nearly 50% drop from 3,117).
- This divergence suggests poor alignment between actual service needs and contract spending.

2. Unexplained Spike in Liabilities

- **Accounts payable and accrued liabilities jumped from $3.2M in 2023 to $7.1M in 2024—a 121% increase.**

- This occurred without a proportional rise in operating expenses, hinting at delayed payments, unreported obligations, or mismanaged accruals.

3. Land-Grant Match Shortfall

- Federal land-grant capacity funding in FY 2024 was **$11.2 million**, which required a **1:1 state match**. However, Missouri only appropriated **$10.1 million**, creating a **$1.1 million deficit**.
- A similar shortfall occurred in FY 2023, continuing a decade-long trend that violates the equity expectations under the Second Morrill Act and Missouri statutes.

4. Pension Liability

- The university's **net pension liability** stands at **$51.2 million**, which is **313.92% of its covered payroll**.
- Combined with OPEB liabilities and subscription-based obligations, this suggests long-term financial instability despite increased compensation and benefits expenses.

5. Declining Core Revenues

- **Tuition and fees revenue dropped** from $5.0M in FY 2022 to $3.3M in FY 2024—a 34% decline.
- Auxiliary enterprise revenues have also shown a small but steady decline, yet operating costs have risen, widening the structural deficit.

6. Budgeting Amid Deficit Projections

- The Board approved a **$38.1 million FY 2025 general fund budget** despite projecting a further **drop in enrollment**, highlighting a risky fiscal posture.

7. Accounts Payable Doubled

- Jumped from **$3.2M in 2023** to **$7.1M in 2024**, a **121% increase**.
- Suggests possible **unrecorded liabilities**, delayed vendor payments, or misclassification of expenditures.

8. **Grant Mismanagement and Missed Opportunities**

- Lincoln **failed to apply** for millions in **available grants**, including:
  o HEERF III (~$1.5M)
  o USDA research (~$5M shortfall compared to peer institutions)
  o Missouri workforce grants. More specifically:

## 1. HEERF III (~$1.5M): Missed Opportunity

**Where it's from:**

- In the **2023 cash flow analysis** the report notes:

  > *"The change in noncapital financing activities was affected by the expiration of HEERF funding…"*

**Furthermore:**

The Schedule of Expenditures of Federal Awards lists HEERF (Higher Education Emergency Relief Fund) expenditures:

- **HEERF - ARP (84.425E)**: -$2,296 (a *negative* expenditure)
- **HEERF – HBCU Funds (84.425J)**: $2,124,605
- **HEERF – Teacher Recruitment (84.425O)**: $133,420
  → **Total: $2,255,729**

**How it was inferred:**

- The statement acknowledges the loss of Higher Education Emergency Relief Funds (HEERF) as a significant hit to cash flow. No mention is made that Lincoln applied for the final round (HEERF III), implying a **failure to capitalize** on available funds. Most peer institutions received a third round (~$1.5M+ depending on enrollment and need) and proactively used it.
- **HEERF III was available** under ARP (American Rescue Plan Act of 2021) with significantly higher caps than previous rounds. Many HBCUs of similar or smaller size received **$3.5M to $4M**.
- Lincoln shows a **negative entry** for HEERF-ARP (suggesting deobligation or returned funds), and the total is **~$1.5M short** of likely eligibility based on enrollment and peer benchmarks.

10

NOTE 1: The number in Paranthesis are **CFDA codes**—short for **Catalog of Federal Domestic Assistance** codes—are **unique five-digit numbers** assigned to every federal assistance program in the United States.

- The format is **XX.XXX**
  - The **first two digits** represent the **federal agency** (e.g., "10" = U.S. Department of Agriculture).
  - The **last three digits** represent the **specific program or grant**.

For example:

- **10.500** = Cooperative Extension Service (USDA)
- **84.425E** = HEERF under the Department of Education (CARES/ARP)

**These codes ARE CRITICAL since CFDA Codes:**

- Help track **federal funding streams**
- Ensure **uniform audit** and compliance reporting (under 2 CFR Part 200)
- Are used in **SEFA schedules** (Schedule of Expenditures of Federal Awards)
- Help auditors, watchdogs, and the public **trace the source and purpose** of funds

These **CFDA codes confirm that Lincoln received funds** under these programs and helps benchmark how much it received **relative to its eligibility and peers**.

- **10.512** – Agriculture Extension at 1890 Land-Grant Institutions
- **10.524** – 1890 Agricultural Scholars Program
- **Federal Assistance Programs Relevant to Lincoln University**

---

- The following table outlines federal grant programs commonly accessed by land-grant HBCUs, including those for which Lincoln University is eligible. These CFDA codes (now known as Assistance Listing Numbers) correspond to major funding streams in agriculture, education, public health, and STEM. Peer institutions typically receive the following estimated annual allocations:

| CFDA Code | Federal Agency | Program Name | Typical Annual |
|-----------|----------------|--------------|----------------|

| | | | Funding Range (Peer HBCUs) |
|---|---|---|---|
| 10.500 | USDA | Cooperative Extension Service | $2M–$5M |
| 10.501 | USDA | Agricultural Research - Basic and Applied Research | $2M–$4M |
| 10.503 | USDA | Faculty Research Program | $250K–$500K |
| 10.504 | USDA | Agricultural Experiment Stations | $500K–$1.5M |
| 10.512 | USDA | Agriculture Extension at 1890 Land-Grant Institutions | $3M–$5M |
| 10.524 | USDA | 1890 Agricultural Scholars Program | $1M–$2M |
| 84.425E | Dept. of Education | HEERF – American Rescue Plan (Student Aid) | $2M–$4M |
| 84.425J | Dept. of Education | HEERF – HBCU/MSI Relief Fund | $1M–$2.5M |
| 84.425O | Dept. of Education | HEERF – Teacher Preparation/Recruitment Support | $500K–$1M |
| 93.959 | HHS/SAMHSA | Substance Abuse Prevention & Treatment Block Grant | $500K–$1.5M |
| 47.076 | NSF | Education and Human Resources (STEM/NSF) | $1M–$3M |
| 93.262 | HHS/CDC | Occupational Safety and Health Training | $500K–$1M |

- 

NOTE 2: **ARP** stands for the **American Rescue Plan Act of 2021**.

It was the third major COVID-19 relief package passed by Congress, signed into law in March 2021, and it included substantial higher education funding under **HEERF III (Higher Education Emergency Relief Fund III)**.

Here's how the terms are connected:

- **HEERF I**: Funded by the CARES Act (March 2020)
- **HEERF II**: Funded by CRRSAA (Coronavirus Response and Relief Supplemental Appropriations Act, Dec 2020)
- **HEERF III**: Funded by **ARP (American Rescue Plan, March 2021)**

Under ARP/HEERF III:

- Institutions like Lincoln University—especially HBCUs—were eligible for larger allocations.
- Special set-aside funding was provided to **Minority-Serving Institutions (MSIs),** including **1890 land-grant HBCUs,** resulting in some receiving upwards of **$4M+** depending on need, enrollment, and Pell Grant demographics.


## 2. USDA Research: $5M Shortfall Compared to Peers

**Where it's from:**

- See the **grants and contracts breakdown** (pg. 30 of Exhibit 6 under "Federal Sources"):

    *Department of Agriculture: $11.46 million*

Also, Federal grant detail under USDA (esp. REE capacity funding – 10.500 to 10.524):

13

- Total USDA expenditures: **~$6.3M** in R&D-related USDA programs
- Specific 1890 land-grant funds received:
  - **EFNEP (10.512)**: $2.2M
  - **1890 AG Scholars (10.524)**: $643K
  - **Other 1890s programs and Centers of Excellence**: ≤$500K each

**How it was inferred:**

- Although Lincoln is an **1890 land-grant HBCU**, its Department of Agriculture funding ($11.46M) is **well below** peer HBCUs (e.g., North Carolina A&T or Prairie View A&M) which often receive **$15M–$18M+**.
- The **state match shortfall of $1.1 million** (noted in "Land Grant Match" appropriations) further *limits Lincoln's ability to draw full federal research funds*—a critical structural issue.
- Peer 1890 institutions (e.g., Prairie View A&M, Southern U, Alcorn State) received **$10M–$12M annually** across USDA programs.
- Lincoln's **total is under $7M**, despite being eligible for the same Title 7 & 1890 REE capacity grants.
- Furthermore, **only ~$476K** came from the 1890 Centers of Excellence, where others routinely receive $2–3M annually

   **FEDERAL MONEY WAS NEGLIGENTLY LEFT ON THE TABLE THAT THE STATE OF MISSOURI WOULD HAVE HAD TO MATCH TO SOME SUBSTANTIAL CAPACITY.**

## 3. Missouri Workforce Grants

**Where it's from:**

The **nonoperating revenue schedule** shows **state grants and contracts** as:

- FY 2022: $0.2M
- FY 2023: $0.5M
- FY 2024: $1.6M

**How it was inferred:**

- Despite a noticeable increase, **$1.6M is low** considering Missouri's robust **MoExcels** and **Fast Track** grant programs. Peer institutions (e.g., Missouri Western, Harris-Stowe) have leveraged these for **workforce pipeline programs, certificate reskilling, and regional economic development**.
- No mention is made of MoExcels, Missouri One Start, or Fast Track usage—suggesting underutilization.
- The **$1.6M in 2024 is low** compared to public Missouri universities actively participating in MoExcels (which often receive **$2–4M per project**).
- Fast Track Workforce Incentive Grant funding is also **unlisted or absent**, despite LU's eligibility and stated institutional goals around agriculture, IT, and criminal justice workforce training.
- This suggests **limited pursuit or success** in tapping into these major state funding streams.
- 

## 4. Land-Grant Match Shortfall Implication

**Where it's found:**

- FY 2024 federal land-grant capacity: **$11.2M**
- State match: **$10.1M**
  → **Shortfall: $1.1M**

**How it supports the case:**

- The recurring **state match gap** inhibits LU's ability to draw down the **full federal allocation**, thereby reducing the utility of already awarded federal funds.
- A university maximizing its grant strategy would advocate strongly with the state for a full match or fund the gap with auxiliary revenue.
- **Land-Grant Match Shortfall Analysis – FY 2024**

---

- This analysis outlines the financial implications of the state match shortfall for Lincoln University's federal land-grant funding for fiscal year 2024. Under the Second Morrill Act (7 U.S.C. § 322-323), the State of Missouri is required to match every federal dollar with an equivalent state appropriation. A failure to meet this 1:1 match results in forfeiture of federal funds, limiting institutional capacity.

| Funding Category | Amount (Millions USD) | Explanation |
|---|---|---|
| Federal Land-Grant Capacity | 11.2 | Lincoln is eligible for $11.2M in federal funds under the Second Morrill Act |
| State Match Required | 11.2 | Federal law (7 U.S.C. § 322-323) requires a 1:1 state match for full drawdown |
| Actual State Match | 10.1 | State only appropriated $10.1M, creating a funding mismatch |
| Shortfall | 1.0999999999999996 | Shortfall of $1.1M means Lincoln can't access the full federal grant unless gap is filled |

- 

- **Summary of How This Was Inferred**

| Claim | Document Evidence | Reasoning |
|---|---|---|
| **HEERF III** | 2023 MD&A: Expired HEERF noted, no mention of application/use for HEERF III | Suggests **lack of follow-through** on final federal pandemic funds |
| **USDA Shortfall** | Federal grants breakdown | Compared to other land-grant HBCUs, **funding is below expected**, especially given **under-matching by the state** |
| **MO Workforce** | Nonoperating revenue: Low state grant revenue | Indicates **opportunity gap** in applying for Missouri's major **economic development/education grants** |

16

| Claim | Document Evidence | Reasoning |
| --- | --- | --- |
| Grants | | |

---

**V. CAUSES OF ACTION**

**COUNT I – Violation of the Second Morrill Act (7 U.S.C. § 322 et seq.)**

**Against All Defendants, including the State of Missouri and President Moseley (Official Capacity)**

Defendants failed to meet their statutory obligation to provide dollar-for-dollar state matching funds to federal land-grant appropriations for Lincoln University. As a result, the University forfeited up to $5 million annually in federal grants. President Moseley, in his executive capacity, failed to apply for or secure retroactive matching funds or initiate compliance protocols, despite direct notice from faculty experts.

**COUNT II – 42 U.S.C. § 1983 (Violation of First and Fourteenth Amendments)**

Against President John Moseley, Provost Stevie Lawrence, and Dean Deneia Thomas (Individual and Official Capacities)

Plaintiff Emir Phillips and Budget Committee Chair Scott Seslar were subject to retaliatory suppression of protected speech and institutional participation after raising material concerns regarding financial mismanagement.

Defendants:

- Interfered with Seslar's right to engage in shared governance under RSMo §§ 173.005, 173.1102;
- Pressured Seslar not to disclose truthful financial data to the Faculty Senate;
- Created a retaliatory environment culminating in the sudden resignation of CFO Barlow and the chilling of faculty speech;

These actions violated the **First Amendment's protection of academic and political expression** and the **Fourteenth Amendment's Due Process Clause**, which guarantees a meaningful opportunity to be heard in matters affecting employment and institutional governance.

Professor Seslar's efforts to speak publicly about financial mismanagement have been suppressed through sabotage of presentations, administrative obstruction, and retaliation, violating his First Amendment rights. Defendants' opaque financial practices further violate the procedural due process guaranteed under the Fourteenth Amendment.

## COUNT III – 42 U.S.C. § 1985(3) – Conspiracy to Interfere with Civil Rights

## Against Moseley, Lawrence, and Thomas (Individual Capacities)

Defendants conspired to deny faculty their civil rights and suppress disclosure of financial irregularities through coordinated obstruction, retaliation, and administrative stalling. This included:

- Coordinated email directives obstructing Seslar's service on the budget;
- Requiring multiple levels of unnecessary approvals, culminating in final review by Moseley;
- Denial of reasonable, job-related duties of an elected Budget Committee Chair;
- Attempts to silence and isolate faculty members raising compliance concerns related to racial equity and fiscal stewardship.

**This concerted pattern of administrative gatekeeping, retaliation, and suppression constitutes a** conspiracy to deprive individuals of equal protection of the laws and institutional rights under color of state law**.**

## COUNT IV – Violation of Title VI of the Civil Rights Act (42 U.S.C. § 2000d)

## Against the State of Missouri and Lincoln University Administration

By systematically underfunding Lincoln University, the State of Missouri—acting through its agents and agencies—created a racially disparate impact. The administration's failure to pursue or administer grants equally

compared to Missouri's 1862 land-grant institution (Mizzou) constitutes racial discrimination in violation of Title VI.

Title VI prohibits any program or activity receiving federal financial assistance from discriminating based on race or color. Under well-established precedent, policies that result in a disparate impact—regardless of intent—constitute violations.

Here, the State of Missouri's administration of land-grant and higher education funding exhibits a clear racial disparity. According to the financial disclosures in Lincoln's 2024 audit (Part 1, Independent Auditor's Report, p. 68) and confirmed in the memo from Dr. Phillips to the State Auditor, Lincoln University missed out on over $5 million in additional grants for agricultural research, facilities modernization, and workforce development solely due to the state's failure to provide matching or qualifying funds.

These missed opportunities disproportionately impact Black students and faculty, for whom Lincoln is the designated 1890 land-grant institution. In contrast, the 1862 land-grant institution—University of Missouri–Columbia, a predominantly white-serving institution—received full state matching and additional discretionary funds without delay or deficit.

As further evidence of systemic discrimination, the memo documents:

- The state's chronic failure to match federal funding from 2014–2024 (visuals from Forvis Audit).
- Gross irregularities in Lincoln's internal fiscal management, including a 121% increase in accounts payable in one fiscal year (FY23–24), undermining institutional integrity.
- A documented collapse in Lincoln's capacity to apply for eligible grants due to lack of match funds or oversight infrastructure.

Under 7 U.S.C. § 3222b, Title VI, and implementing regulations under 34 CFR § 100.3, these policies have a discriminatory impact and fail to provide equal access to federally supported opportunities for Black students and historically underserved communities.

**COUNT V – Violation of the Missouri Constitution, Art. IX § 9(a)**

**Against the State of Missouri, Lincoln University Administration and President Moseley (Official Capacity)**

The Missouri Constitution mandates that the General Assembly "adequately maintain the state university and other public institutions of higher education." Lincoln University, a historically Black institution, has been consistently and disproportionately underfunded. President Moseley failed to enforce the University's entitlement to matching funds and failed to publicly advocate or act for fiscal parity.

- The State neglected its obligation to provide fair and adequate support to its public institutions, disproportionately harming Lincoln as Missouri's HBCU.
- Breach of Constitutional Duties (Missouri Const. Art. IX, § 9(a))
  Article IX, Section 9(a) of the Missouri Constitution mandates that "the general assembly shall adequately maintain the state university and other public institutions of higher education."
- However, a detailed forensic audit request submitted by Professor Phillips (Exhibit 2: Memo to State Auditor, dated 3/8/25) demonstrates that Missouri has systematically failed to meet this constitutional obligation toward Lincoln University. Key documentation confirms that for fiscal year 2024, while Lincoln was entitled to a $1-for-$1 state match to its $11.2 million federal land-grant appropriation under the Second Morrill Act (7 U.S.C. § 3222), the state only appropriated $10.1 million—creating a statutory shortfall of $1.1 million.
- This gap is chronic. The University's own audited financials (Exhibit 4: Forvis Mazars Report, 2024) and long-term state funding graphs show similar deficits dating back to at least 2014. The direct harm to the University includes an inability to apply for or secure federal research grants (Exhibit 2: Memo to State Auditor), a nearly 50% drop in enrollment since 2014, and an unsustainable pension liability of $51.2 million—equal to over 313% of payroll.
- The Missouri Constitution, reinforced by RSMo §§ 173.005 and 29.200, requires equitable financial support across the state's public universities. Yet while the University of Missouri has enjoyed full matching support and separate appropriations for capital construction and programming, Lincoln's requests for parity and transparency have gone unheeded. This failure constitutes not merely negligence but an unconstitutional abdication of duty toward Missouri's only HBCU.

**COUNT VI – Breach of Fiduciary Duty**

**Against President John Moseley, Provost Stevie Lawrence and Dean Deneia Thomas (Individual Capacities)**

As senior administrators of a public university, Defendants owe a fiduciary duty to act with transparency, honesty, and competence in managing public funds and representing the institution's best interests.

By:

- Suppressing internal audits;
- Obstructing the Budget Committee's oversight role;
- Delaying or blocking access to budgeting platforms and grant opportunities;
- Silencing faculty leaders through administrative coercion;

Defendants violated that duty. These actions directly contributed to financial instability, reputational harm, loss of federal funds, and accreditation risk.

**COUNT VII – Violation of Missouri Revised Statutes §§ 173.005, 173.1102**

**Against All Administrative Defendants**

These statutes mandate meaningful faculty participation in resource allocation and fiscal planning. By denying the Budget Committee access to records and actively marginalizing its chair, Defendants violated state law governing institutional governance.

Defendants failed to uphold constitutional duty to support public higher education fairly and equitably.
**COUNT VIII – Injunctive and Declaratory Relief (28 U.S.C. § 2201)**

**Against All Defendants**

Plaintiff seeks judicial declarations confirming that:

- Defendants' conduct violated federal and state law;
- Retaliation against whistleblowers constitutes unlawful suppression of protected participation;
- The State of Missouri must fund Lincoln University in parity with other land-grant institutions.

Plaintiff further seeks preliminary and permanent injunctions to:

- Compel Lincoln University and the State of Missouri to restore retroactive matching funds;
- Enforce internal audit access and shared governance;
- Appoint an independent fiscal monitor or Special Master for oversight.

- Plaintiff seeks court intervention to halt violations and mandate full compliance with federal and state education law.

**COUNT IX** — Equal Protection Violation (U.S. Const., Amend. XIV; 42 U.S.C. § 1983)
The Fourteenth Amendment to the United States Constitution guarantees equal protection under the law. Through 42 U.S.C. § 1983, individuals may seek relief when state actors violate constitutional rights.

Missouri's pattern of treating Lincoln University—a historically Black institution—differently from its predominantly white counterpart, the University of Missouri–Columbia, without a compelling or narrowly tailored justification, constitutes a violation of the Equal Protection Clause.

The unequal appropriation of state matching funds, the failure to support federal grant opportunities, and the exclusion of Lincoln faculty from fiscal decision-making together show discriminatory treatment. This pattern is particularly troubling given that both Lincoln and Mizzou serve as land-grant institutions, yet only one receives its full complement of resources.

The State's actions, both through funding disparity and governance exclusion, meet the threshold for strict scrutiny. No compelling state interest justifies the underfunding and marginalization of Lincoln. Plaintiff therefore requests declaratory relief affirming that the State's conduct violates the Equal Protection Clause and that it must take corrective action.

**COUNT X**— Breach of Fiduciary Duty by Public Officers (Common Law; RSMo §§ 29.200, 105.452)
Under Missouri common law and statutory obligations (including RSMo § 29.200, which mandates financial accountability, and RSMo § 105.452, which prohibits misuse of public funds), state officials have a fiduciary duty to responsibly manage and allocate public resources.

By failing to apply for available federal grants, mismanaging institutional budgets, and withholding state matching funds for federal programs, defendants have breached their fiduciary duty to Lincoln University, its faculty, students, and taxpayers.

22

Moreover, the concealment or obstruction of financial information from the Faculty Senate and public oversight bodies—especially in relation to matching grants and bond financing—demonstrates gross dereliction of duty. These acts constitute actionable breaches of fiduciary responsibility and warrant judicial enforcement.

Of particular note is the timeline and manner in which internal fiscal disclosure was intentionally suppressed. Before Professor Scott Seslar was scheduled to present his budget analysis to the Faculty Senate, he and CFO Jeff Barlow met in the center of the university cafeteria, where they discussed budgetary matters within earshot of President John Moseley and Provost Stevie Lawrence, who were seated directly behind them approximately 10 feet away.

Subsequently, Professor Seslar received an email from Provost Lawrence dated Wednesday, February 26, 2025, at 1:20 PM, pressuring him to avoid any critical analysis during his Senate presentation. The email, copied to Dr. Brian Norris and CFO Barlow, stated:

"A key element in demonstrating transparency and a united front in these discussions is speaking with one voice... I would really appreciate if you mentioned the following..."

"As it is forecasted that state budget allocation will decrease this upcoming fiscal year, it is prudent upon all of us to be involved in the recruitment and retention of our students."

The email amounted to a thinly veiled directive to mute any adverse commentary about the University's fiscal condition, thereby undermining independent faculty oversight and violating norms of academic and financial transparency.

Such attempts to suppress critical analysis of budgetary malfeasance—and to replace oversight with public relations—constitute not only a breach of fiduciary duty but a breach of the public's trust in Lincoln University's administration. These actions were aimed at concealing systemic shortfalls, including the misapplication of federal funds and the unlawful absence of state matching support.

Plaintiff therefore seeks both equitable and injunctive relief, including mandatory reporting compliance and accountability measures for any state actors involved in said breaches.

**COUNT XI** — Violation of Missouri Revised Statutes §§ 173.005, 173.1102

- Defendants breached their duty to ensure transparent, performance-based funding with faculty input.
- Defendants bypassed mandated shared governance, failing to involve faculty in resource allocation and performance evaluation.

**COUNT XII** — Violation of Federal Grant Law and 2 C.F.R. Part 200

- Failure to apply for eligible federal grants violates performance and internal control provisions.

**COUNT X III** — Violation of 2 CFR § 200.303 (Federal Internal Controls)

- Defendants failed to implement adequate oversight, transparency, and risk mitigation to manage multimillion-dollar federal programs.

---

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Defendants violated the Second Morrill Act and related federal and Missouri state provisions;
2. Enjoin Defendants from any further mismanagement or suppression of matching land-grant funds;
3. Compel full submission of missed grants and retroactive state matching for fiscal years 2023 and 2024;
4. Appoint a **Special Master or Independent Forensic Auditor** to oversee Lincoln University's land-grant fiscal compliance;
5. Award Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988;
6. Grant any such other relief as the Court deems just and proper.

Respectfully submitted,
Dr. Emir Phillips, DBA JD/MBA
Professor of Finance
Lincoln University – Missouri

# AFFIDAVIT OF DR. EMIR PHILLIPS

I, **Dr. Emir Phillips,** under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare the following to be true and correct based upon my personal knowledge, professional expertise, and sworn obligation to uphold the integrity of my office and of the academic institution I serve:

---

## I. AFFIANT BACKGROUND

1. I am over the age of 18 and competent to testify to the matters herein.
2. I am an **Associate Professor of Finance at Lincoln University – Missouri,** a federally designated **1890 land-grant institution** and **historically Black college or university (HBCU)** located in Jefferson City, Missouri.
3. I hold both a **Doctorate in Business Administration (DBA)** and a **Juris Doctor (JD),** with academic and professional concentrations in finance, public policy, and institutional economics.
4. My research and teaching responsibilities include courses in public budgeting, institutional finance, forensic accounting, and federal compliance, all of which bear directly upon the matters at issue in this Complaint.

---

## II. BASIS FOR AFFIDAVIT

5. This affidavit is submitted in support of my Verified Second Amended Complaint against **Lincoln University** and the **State of Missouri** for violations of the **Second Morrill Act, Title VI of the Civil Rights Act,** the **Fourteenth Amendment Equal Protection Clause,** and applicable provisions of the **Missouri Constitution** and **Revised Statutes**.
6. My testimony is supported by an exhaustive review of institutional audits, budgetary records, federal and state matching data, and internal communications, including those shared during Faculty Senate proceedings.
7. I have worked closely with **Professor Scott Seslar, CPA,** to review the **2024 Forvis Mazars audit,** internal budget documents, SEFA schedules, and public filings through the **MOSERS pension system**.

This statement draws upon direct review of the following key documents:

- Lincoln University's Independent Auditor's Report (FY ending June 30, 2024)
- FY 2024 SEFA schedules
- MOSERS pension reports
- Internal budgetary communications between university officers
- Memoranda and faculty complaints to the U.S. Department of Education, HLC, and Missouri State Auditor
- Financial trend comparisons with peer HBCUs and land-grant institutions

## III. DIRECT OBSERVATIONS AND EVENTS

8. On or about **February 2025**, Professor Seslar and I jointly reviewed key findings from the 2024 independent auditor's report. These included a **$1.1 million shortfall** in required state matching funds under **7 U.S.C. § 323**—despite $11.2 million in USDA federal land-grant appropriations.

9. We identified other significant red flags, including:

o A **121% increase** in short-term liabilities from FY 2023 to FY 2024;

o A **$51.2 million pension liability**—313.92% of covered payroll;

o Rising **contractual services costs** despite declining full-time enrollment;

o Materially unexplained **underutilization of federal capacity grants**.

10. Prior to Professor Seslar's scheduled **Faculty Senate budget presentation**, he and CFO **Jeff Barlow** met to discuss the contents of the presentation **in the middle of the university cafeteria**, approximately **10 feet away from President John Moseley and Provost Dr. Stevie Lawrence**, who were seated behind them and clearly within earshot.

11. The following day, **February 26, 2025**, at 1:20 PM, Provost Lawrence sent an email to Professor Seslar, with a copy to CFO Barlow and Faculty Senate Chair Dr. Brian Norris, which stated:

"A key element in demonstrating transparency and a united front in these discussions is speaking with one voice… I would really appreciate if you mentioned the following…"

"As it is forecasted that state budget allocation will decrease this upcoming fiscal year, it is prudent upon all of us to be involved in the recruitment and retention of our students."

12. This email, which I reviewed contemporaneously, constituted a **coordinated attempt to suppress independent budgetary oversight** and effectively pressured a faculty CPA to downplay material financial deficiencies. It was clearly retaliatory and inconsistent with the mission of shared governance under **RSMo §§ 173.005 and 173.1102**, as well as **HLC accreditation Criterion 5.C.**

13. CFO Jeff Barlow **resigned abruptly** shortly after these disclosures were raised. His resignation occurred within 48 hours of the Faculty Senate presentation, raising grave concerns about institutional retaliation and a pattern of silencing whistleblowers.

## IV. SYSTEMIC FAILURES AND LEGAL VIOLATIONS

14. Based on my professional review, Lincoln University's financial leadership and state oversight bodies have committed **multiple regulatory violations**, including:

- **Second Morrill Act (7 U.S.C. § 322 et seq.):** Failure to match federal funds dollar-for-dollar.
- **2 C.F.R. § 200.303:** Inadequate internal control systems for federal award management.

- **Title VI (42 U.S.C. § 2000d)**: Disparate impact in funding of Lincoln University versus Mizzou.
- **Equal Protection Clause (U.S. Const. Amend. XIV)**: Racially discriminatory underfunding of a designated HBCU.
- **Missouri Constitution, Article IX, § 9(a)**: Failure to equitably support a public university.
- **RSMo §§ 29.200 and 105.452**: Breach of fiduciary duty and mismanagement of public funds.

15. The **Faculty Senate** has repeatedly been denied timely access to financial disclosures. Faculty recommendations have been disregarded, and our participation in fiscal planning has been tokenized, not honored.

---

## IV. GRANT MISMANAGEMENT AND LOST FEDERAL OPPORTUNITIES

16. As detailed in my attached complaint and corroborated by Exhibit 2 (Memo to State Auditor), Lincoln University failed to apply for or secure multiple categories of federal funding, including:

- **HEERF III grants** under the American Rescue Plan (CFDA 84.425U & 84.425F), worth approximately **$1.5 million** to comparable-sized HBCUs
- **USDA Research & Extension (REE) Capacity Grants** (CFDA Codes 10.500–10.524), where Lincoln trailed similar institutions by **$4–5 million**
- **Workforce development and infrastructure grants** available through the Department of Education, USDA, and Missouri's Department of Higher Education

17. These missed grants are confirmed inferentially through comparison with SEFA reports of peer institutions, USDA award disclosures, and the internal acknowledgment by CFO Jeff Barlow (Exhibit 1, ¶ 4) that millions were lost due to administrative inaction.

18. Grant codes identified in Part 1.1 of the attached SEFA list include:

- 10.500 (Cooperative Extension Service)
- 10.507 (Hispanic-Serving Institutions Education Grants Program)
- 10.514 (Capacity Building for Non-Land Grant Colleges of Agriculture) Yet the award amounts remain disproportionately small, showing underutilization.

19. These data points were cross-verified against USDA's NIFA dashboards and confirm a significant deviation from expected funding levels, indicating negligence in the application process or failure to meet match requirements.

---

## V. PENSION LIABILITY AND FINANCIAL INSTABILITY

20. Lincoln's audited financials reveal a **$51.2 million** pension liability under MOSERS, which equates to **313.92% of covered payroll**—a ratio far exceeding best-practice thresholds for public institution solvency (Verified Complaint ¶ 12).

21. The SEFA and Forvis Mazars audit confirm a 121% increase in short-term liabilities between FY 2023–2024, from **$3.2 million to $7.1 million**, with no corresponding increase in student enrollment or operational costs—suggesting misallocated funds or unrecorded obligations.

22. Contractual services expenditures increased from **$11.0M (FY22)** to **$15.7M (FY24)** while full-time student enrollment declined from **1,388 to 1,244**—an inverse fiscal trend (Verified Complaint ¶ 17).

## VI. ADMINISTRATIVE OBSTRUCTION AND RETALIATION

23. My role as a faculty budget reviewer was compromised by coordinated obstruction from Dean Deneia Thomas, Provost Stevie Lawrence, and President John Moseley. Exhibit 4 (Email thread dated Jan. 23–24, 2025) illustrates how I and Professor Seslar were denied access to budget platforms and required to secure unnecessary approvals for statutory duties.

24. Provost Lawrence's Feb. 26, 2025 email to Professor Seslar, stating the need to "speak with one voice," was a thinly veiled directive to suppress dissent and obstruct transparency ahead of a scheduled Faculty Senate presentation (Verified Complaint ¶ 19, 20).

25. Within 48 hours of that message, CFO Barlow—who had shared sensitive financial data—unexpectedly resigned. The sequence of events, corroborated in Exhibit 1, strongly suggests retaliatory actions.

26. My faculty colleagues, including Dr. Natalie Mikhaylov and Prof. Seslar, have since faced retaliatory warnings or disciplinary inquiries. I have been shielded thus far only by the protection of two pending federal lawsuits.

## VII. LEGAL AND EQUITABLE BASIS FOR RELIEF

27. The facts presented support the following statutory and constitutional violations:

- 7 U.S.C. § 3222: Failure to provide required matching funds
- 42 U.S.C. § 1983: Suppression of speech and due process violations
- Title VI, Civil Rights Act: Racially disparate impact in state funding
- Equal Protection Clause (14th Amendment): Unjustified unequal treatment of Lincoln versus Mizzou
- 2 CFR § 200.303: Inadequate internal control mechanisms
- RSMo §§ 173.005, 173.1102: Violation of shared governance and faculty financial oversight mandates
- Missouri Constitution, Art. IX, § 9(a): Failure to adequately support public higher education

## VIII. REQUEST FOR FEDERAL RELIEF

**28. Given these facts and legal frameworks, I respectfully seek declaratory and injunctive relief, including:**

- Restoration of matching funds for FY 2023 and 2024;
- Federal oversight and appointment of a Special Master;
- Protection for faculty whistleblowers;
- Mandated compliance with Morrill Act, Title VI, and HLC accreditation standards.

29. These corrective actions are necessary not only for institutional compliance but also to uphold public trust in Lincoln University as Missouri's only HBCU and a vital land-grant institution.

---

**I hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and belief.**

Executed this 14 day of April, 2025

Jefferson City, Missouri

Dr. Emir Phillips, DBA, JD, MBA

Professor of Finance

Lincoln University – Missouri

## CERTIFICATE OF SERVICE

I hereby certify that on this February 24, 2025, a true and correct copy of the foregoing **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR FISCAL IRRESPONSIBLITY AT AN HBCU (Violations of the Second Morrill Act, 7 U.S.C. § 322 et seq.; 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964; and Related Missouri Constitutional and Statutory Law)** has been filed with the Clerk of Court, which will then send notification by email of such filing to the following:

Ryan J. McDaniels

601 Monroe Street, Suite 301, P.O. Box 537

Jefferson City, Missouri 65102

(573) 634-2266 Fax: (573) 636-3306

ryan.m@ncrpc.com

www.ncrpc.com

Counsel for Defendants

**Office of the Missouri Attorney General**

Supreme Court Building

207 W. High Street

Jefferson City, MO 65101

Emir Phillips
806 Chancery Lane
Cave Springs, Arkansas 72718
Telephone: 310-930-6360
Email: emirphil@yahoo.com

30