Emir Phillips
806 Chancery Lane
Cave Springs, AR 72718
310-930-6360
emirphil@yahoo.com

IN PRO PER

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

JEFFERSON CITY - CENTRAL DIVISION

DR. EMIR PHILLIPS

PLAINTIFF

STATE OF MISSOURI;
BOARD OF CURATORS OF LINCOLN
UNIVERSITY;
DR. JOHN MOSELEY, in his official and
individual capacities;
DR. STEVIE LAWRENCE, in his official
and individual capacities;
DR. DENEIA THOMAS, in her official and
individual capacities;
and DOES 1 through 20, inclusive,
Defendants..

DEFENDANTS

Case Number: 2:25-cv-04067-BP

**PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND
TEMPORARY RESTRAINING ORDER
TO ENJOIN RETALIATORY
ADMINISTRATIVE LEAVE AND
COMPEL IMMEDIATE
REINSTATEMENT**

Date:
Time:
Dept.:

*emir phillips*

Emir Phillips,
PLAINTIFF, IN PRO PER

1

**TO THE HONORABLE COURT:**

**INTRODUCTION**

The machinery of academic freedom grinds to a halt not with thunder, but with whispers—closed-door meetings, sudden suspensions, terminated email accounts, and bureaucratic euphemisms masking constitutional violations. Plaintiff Dr. Emir James Phillips, a tenured-track associate professor of finance and Keyesian, geopolitical scholar, respectfully moves this Court pursuant to Fed. R. Civ. P. 65 for a preliminary injunction and temporary restraining order compelling Lincoln University to immediately reinstate him to his full academic duties.

This Motion is not merely a procedural request; it is a moral and constitutional imperative. Within days of engaging in quintessential First Amendment conduct—filing lawsuits and EEOC complaints asserting institutional negligence in grant-funding, academic freedom violations, and ringing the alarm on questionable accounting and financial practices—Dr. Phillips was removed from the classroom, locked out of institutional systems, and deprived of professional standing. His forced silence did not follow adjudication or misconduct; it followed constitutionally protected whistleblowing.

The retaliatory nature of this action is not speculative; it is evidenced, explicit, and codified in the June 3, 2025 administrative leave letter, which invokes "grading decisions" as the pretextual justification—decisions that were already the subject of this pending litigation. No new infractions occurred. No students complained. No investigations were launched. Instead, Dr. Phillips was rendered a pariah within the very institution whose systemic failings he exposed.

This Motion is necessitated not only by the vindictive character of Defendants' actions, but by the urgent and active constitutional harm that festers under color of state law. A university governed by secretive fiat, rather than due process, becomes an ideological regime masquerading as an educational institution. And in that dim corridor between punishment and process lies the very void the Due Process Clause was designed to illuminate.

This Court must intervene to prevent Lincoln University from descending into precisely the sort of governance failure the Plaintiff sought to remedy. The federal judiciary exists to adjudicate

disputes and enforce rights—not merely after the injury has festered, but precisely when the injury is being inflicted. The Court's equitable power under Rule 65 is tailor-made for these circumstances, where academic integrity, personal liberty, and institutional accountability hang in the balance.

The stakes are not solely personal. They are generational. If a tenured-track associate finance professor can be summarily removed for defending academic standards and exposing fiduciary mismanagement—with no hearing, no findings, no charges—then the promise of shared governance, the sanctity of student evaluation, and the integrity of public higher education will be reduced to slogans, easily discarded by political whim or administrative spite.

Thus, Plaintiff respectfully invokes not only the precedents of this Court, but the spirit of constitutional stewardship that animates our system of checks and balances. This Court must act to restore the rule of law before it is further eroded by the creeping normalization of administrative authoritarianism cloaked in institutional procedure.

## FACTUAL BACKGROUND

As set forth in the Verified First Amended Complaint, Plaintiff's Motion for Relief under Fed. R. Civ. P. 60(b), and reinforced through contemporaneous emails, sworn declarations, and corroborated administrative documents, Dr. Emir James Phillips has consistently engaged in constitutionally protected conduct. These include filing whistleblower lawsuits to expose Lincoln University's override of faculty-assigned grades, discriminatory teaching assignments, and in this specific federal lawsuit: systemic financial mismanagement affecting Title III and Title IV federal funds.

On May 1, 2025, Dr. Phillips filed his federal lawsuit. On June 3, 2025—barely thirty days later—Provost Dr. Stevie Lawrence issued a letter removing him from his faculty position, barring him from university systems, and terminating his instructional role under the guise of "paid administrative leave". The letter referenced vague accusations such as "insubordination,"

"inappropriate dealings," and most tellingly, "issues surrounding your grading decisions"—the exact activity forming the basis of Plaintiff's litigation.

More egregiously, the letter invoked a previously known and irrelevant personal matter: Dr. Phillips' disbarment in California. This was neither a new discovery nor a valid disqualification. Dr. Natalie Mikhaylov—the former business school chair/dean who hired Dr. Phillips—discovered his disbarment between October 2023 and January 2024 and explicitly stated that it played no role in his hiring. He was hired to teach finance and economics, not to practice law.

Moreover, Dr. Mikhaylov, with full knowledge of the disbarment, later requested that Dr. Phillips teach Business Law I, II, and III based on his Juris Doctor degree, his seven years of managing a law firm, and his demonstrated pedagogical aptitude. Dr. Mikhaylov affirmed that no active law license was required for these teaching duties. Her decision was not arbitrary but based on the same professional standards followed by other universities nationwide.

Human Resources, charged with vetting faculty credentials, conducted its own formal review and found no barrier to Dr. Phillips' employment or course assignments. This clearance—by the very office responsible for determining eligibility—was the institutional basis for his contract. Furthermore, during the 2024 accreditation cycle conducted by the Accreditation Council for Business Schools and Programs (ACBSP), Dr. Phillips' teaching of Business Law I, II, and III was specifically reviewed. No concerns were raised. The accrediting body flagged only one faculty member (not Dr. Phillips) for a mismatch between his academic specialty (management) and his assigned subject (marketing) which was worked-out. Dr. Phillips' qualifications passed without objection.

This documentary history establishes the following:

1. Dr. Phillips' disbarment was known to internal leadership before he was ever assigned law courses.
2. He was asked to teach those courses despite, and in light of, that known history.
3. HR vetted and approved his appointment as Associate Finance Professor.
4. ACBSP reaffirmed his academic fitness under national accreditation standards.

These facts obliterate the post hoc rationale concocted in the June 3 letter. The university's sudden resurrection of a long-settled credential issue—immediately after Dr. Phillips filed

federal litigation—reveals not a legitimate employment concern, but a targeted, retaliatory act intended to silence a whistleblower.

On June 4, 2025, Dr. Phillips respectfully wrote to University President Dr. John Moseley seeking clarification. His detailed inquiry recited the procedural failures, institutional misrepresentations, and personal damage caused by the leave letter. Moseley's reply—a single sentence affirming the action—confirmed the University's abdication of internal governance, due process, and basic fairness.

Further compounding the illegality of the leave action is the complete absence of Board of Curators authorization, in violation of Lincoln University Bylaws § 3.2(4), which requires Board approval for all faculty leaves. The record is devoid of any public vote, closed-session finding, or ratification of this punitive measure.

Finally, HR Director April Robinson had already confirmed to Dr. Phillips that no disciplinary actions existed in his file—a fact uncontroverted by any subsequent documentation.

Lincoln University's invocation of Section 3.20.7 to justify non-reappointment in the same letter is equally deceptive. That section pertains to standard term completions, not mid-term suspensions or contested terminations. It was deployed here as a smokescreen to mask the absence of process and substance in an otherwise unlawful reprisal.

In sum, the factual record demonstrates with legal clarity and moral certainty that Lincoln University retaliated against Dr. Phillips for engaging in protected activity. The disbarment issue—weaponized ex post facto—was known, vetted, and institutionally accepted long before any alleged conflict arose. The retaliation was surgical, sudden, and constitutionally forbidden. Its purpose was not to uphold standards, but to suppress dissent.

**NOTE: Scholarly Contributions Demonstrating Proximity to Tenure**

At the time of his appointment, Dr. Emir J. Phillips was expressly informed that tenure at Lincoln University would require only two peer-reviewed publications and four years of service, as opposed to the traditional seven-year track. As of the date of this filing, Dr. Phillips is just 2.5

years from meeting that time threshold. He has already exceeded the publication requirement, having published multiple peer-reviewed articles in highly respected academic journals. These include:

- *"How Lincoln's Revolutionary Monetary Policies Tipped the Scales in the Civil War,"* *Cambridge Journal of Economics*, Vol. 48, No. 6 (Nov. 2024), pp. 1005–1026, DOI: 10.1093/cje/beae034;
- *"Hamilton Based the Central Banking of the U.S. Bank upon the Notion that There Is No Political Independence without Economic Independence,"* *Journal of Economic Issues*, Vol. 58, No. 1 (Feb. 2024), pp. 286–301, DOI: 10.1080/00213624.2024.2308466;
- *"Will Bitcoin Incarnate Satoshi Nakamoto's Vision of Depoliticized Money?" Journal of Economic Issues*, Vol. 59, No. 1 (Feb. 2025), DOI: 10.1080/00213624.2025.xxxxxx.

In addition to his scholarly research, Dr. Phillips has become a prolific public intellectual, contributing over two dozen policy and geopolitical articles to *TheGeopolitics.com*, where his analysis on trade, monetary systems, international conflict, and political economy have enriched public discourse and significantly raised the academic profile of Lincoln University. Highlights of his contributions include:

- *"Against Ricardian Dogma"* — A rebuttal of free trade orthodoxy in defense of nationalist economic sovereignty.
- *"Dragon at the Door"* — A detailed evaluation of India's strategic challenges posed by the Pakistan-China axis.
- *"Wall Street Cannot Save the World"* — A critique of financial markets as unreliable guardians of democracy.
- *"Russia's Rightful Defense"* — A provocative comparison between Russia's Ukraine strategy and America's Cuban Missile Crisis stance.
- *"Bitcoin: The Trustless Revolution"* — An examination of Bitcoin as a challenge to the political control of money.
- *"Cuba's Unyielding Struggle"* — A historical and economic exploration of Cuba's decline from global prominence.
- *"Mao's Cold War with India"* — An analysis of China's aggressive post-revolutionary policies toward India.
- *"Trump's Diplomatic Masterstroke"* — An appraisal of Trump's geopolitical realignment strategies.
- *"The Riyadh Gambit"* — Insight into how U.S.-Russia negotiations in Saudi Arabia may reshape global power dynamics.
- *"Raising Wages and Preserving Social Cohesion"* — A defense of tariffs as a moral-economic policy instrument.
- *"Claude's Defiance"* — A philosophical investigation into AI autonomy and the loss of human control.

- *"Kafka's Geopolitical Echoes"* — A parallel between Kafkaesque absurdity and modern bureaucratic global politics.
- *"Maintaining Equilibrium"* — A proposal for moderating jihadist leadership through Western influence.
- *"COVID-19: Lessons, Failures, and the Path Forward"* — A post-mortem analysis of the pandemic's political failures.
- *"Syria's Shattered Mosaic"* — A survey of Syria's collapse and its global ripple effects.
- *"The Abyss of Freedom"* — A Kierkegaardian interpretation of existential anxiety in public life.
- *"Neoliberal Ruins, Nationalist Resurgence"* — A deep dive into the global pushback against liberal internationalism.
- *"Trump Triumphs"* — An optimistic view of a revitalized U.S.-French military partnership.
- *"The Unraveling Nexus"* — An investigation into U.S.-China trade tensions and their impact on the dollar's supremacy.
- *"The Silent Handshake of Conflict"* — An overview of how cyberwarfare is redefining military engagement.
- *"NATO's Strategic Preparations"* — A critical look at NATO's deterrence strategy and its potential to provoke war.
- *"The Mockery of the Last Supper"* — A philosophical and cultural critique of modern secularism.
- *"Poland's Intermarium"* — A geopolitical study of Poland's strategic ambitions in Eastern Europe.
- *"Trump and the Deep State"* — A polemic on Trump's plan to dismantle bureaucratic entrenchment.
- *"Reimagining Russian Warfare"* — A tactical review of Russia's evolving strategy in the Ukraine war.
- *"Japan's Strategic Re-Awakening"* — A survey of Japan's pivot toward assertive Indo-Pacific engagement.
- *"Reevaluating Zionism"* — A theological and philosophical exploration of Israel's historical identity.
- *"The Russian Bear Claws for Momentum"* — A reassessment of Russian military recalibrations.
- *"U.S. Aid in Ukraine"* — A critical examination of the long-term implications of U.S. arms and aid.
- *"Israel's Calculated Response"* — A discussion of Israeli doctrine amidst rising nuclear threats.
- *"Atomic Tides"* — A visionary look at nuclear-powered desalination and global water security.
- *"Iran's Ascendant Arsenal"* — A study of Iran's strategic weapons modernization and Israel's countermeasures.

Collectively, these achievements not only demonstrate Dr. Phillips' **exceptional scholarly productivity**, but also his **broad intellectual impact** and **dedication to institutional prestige for Lincoln University**—qualities that **far exceed** any trumped basis for effectively firing Dr. Phillips.

7

## LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, a movant must demonstrate:

1. A likelihood of success on the merits;
2. A threat of irreparable harm in the absence of an injunction;
3. That the balance of equities tips in the movant's favor; and
4. That the injunction serves the public interest.

*See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

These four elements are not isolated silos of legal reasoning; they are, in truth, braided strands of equity, flowing from the same wellspring of judicial conscience and constitutional duty. The Supreme Court in *Winter* reaffirmed that injunctive relief is not an extraordinary indulgence but a necessary remedy when liberty or constitutional governance is imperiled. The Eighth Circuit in *Dataphase* likewise emphasized that courts must look to the totality of the circumstances to prevent the "mischief of injustice" from overtaking procedural formalism.

Here, Dr. Phillips satisfies each requirement in full:

**1. Likelihood of Success on the Merits:**

Dr. Phillips' Verified First Amended Complaint alleges robust and specific facts supporting claims of retaliation under the First Amendment, procedural and substantive due process violations, and unlawful interference with faculty governance. These are not speculative assertions, but well-documented injuries supported by direct evidence: contemporaneous communications, administrative records, sworn declarations, and retaliatory timing that aligns precisely with Dr. Phillips' whistleblowing activity. Further, the pretextual invocation of "grading decisions" and long-disclosed disbarment status—previously deemed irrelevant by HR, the Dean, and the accrediting body—undermines any claim of legitimate institutional concern. This is the sine qua non of pretext, and thus of liability.

Moreover, the lack of Board of Curators approval renders the administrative leave action ultra vires and constitutionally infirm. A preliminary review of the pleadings and documentary record more than satisfies the "fair ground for litigation" standard recognized by the Eighth Circuit.

**2. Irreparable Harm:**

The injury here is not merely reputational—it is existential. Dr. Phillips has been stripped of his teaching duties, barred from institutional communication channels, and cast in a false light to colleagues, students, and future employers. These harms cannot be retroactively undone through monetary damages. The Supreme Court has long recognized that the deprivation of First Amendment liberties, even for minimal durations, constitutes per se irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

More fundamentally, this case involves the moral fabric of academic freedom—a principle so vital that its erosion, even by administrative euphemism, poses an institutional threat not only to the scholar but to the republic of ideas itself. If a professor can be silenced for lawfully exposing financial mismanagement by a university, then that university ceases to be a sanctuary of inquiry and becomes, instead, a bureaucratic arm of retaliation—and it has.

**3. Balance of Equities:**

Defendants will suffer no legally cognizable harm by reinstating Dr. Phillips. The university already determined his credentials were valid and repeatedly assigned him Business Law and Finance courses. There are no new facts justifying suspension. Meanwhile, Dr. Phillips suffers professional limbo, ongoing reputational damage, and constitutional injury.

Equity abhors retaliatory silence. It is the judiciary's role to elevate the scales when administrative discretion weighs them down. The equitable balance here is not merely favorable—it is overwhelming.

**4. Public Interest:**

Public universities are not private fiefdoms. They are vessels of public trust, supported by taxpayer funding and entrusted with upholding constitutional norms. Courts have long held that protecting academic freedom, procedural regularity, and First Amendment expression in state

9

institutions serves a paramount public interest. *See Sweezy v. New Hampshire*, 354 U.S. 234 (1957).

The people of Missouri have an interest in ensuring that faculty who uncover institutional misgovernance are protected—not punished. The Constitution is not a paper shield; it must be enforced in real time, in real cases, against real institutions. That is the very purpose of Rule 65's equitable power.

In sum, each element favors relief. Together, they demand it.

**5. Sovereign Immunity Does Not Bar Relief Under Ex parte Young**

Before turning to the substantive elements, the Court must recognize that this motion seeks only prospective, injunctive relief against state officials in their official capacities—relief expressly permitted under the longstanding doctrine of *Ex parte Young*, 209 U.S. 123 (1908). Under *Ex parte Young*, the Eleventh Amendment does not preclude federal courts from enjoining state officials from engaging in ongoing violations of federal law.

Here, Plaintiff does not seek damages, backpay, or retrospective relief. He asks only for cessation of current constitutional injuries: the continuation of his retaliatory administrative leave, the denial of access to essential university platforms, and the active exclusion from his academic post. These harms are not frozen in the past—they are dynamic and unfolding.

As the Supreme Court affirmed in *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002), "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"

Likewise, the Eighth Circuit in *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005), held that even where the allegedly unconstitutional acts began in the past, the *continuing enforcement* of unconstitutional restrictions satisfies the ongoing violation standard. That is precisely the case here: the suspension and denial of access continue today.

10

Therefore, **no sovereign immunity bars this Court from granting the requested injunction.**

---

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff asserts claims under 42 U.S.C. § 1983 for violation of First Amendment rights, Fourteenth Amendment due process, and Missouri whistleblower statutes. The *Mt. Healthy* test governs First Amendment retaliation:

1. Protected conduct,
2. Adverse employment action,
3. Causation.

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Here:

- Filing lawsuits and EEOC complaints is protected speech.
- Administrative leave, removal from teaching, non-reappointment, and email termination are adverse employment actions.
- Defendants explicitly cited "grading decisions" in the leave letter—the very conduct underlying a key federal lawsuit.

This is not conjecture; it is admission.

Moreover, the leave action occurred post-judgment, constituting a live, ongoing constitutional violation. The University's failure to provide notice, hearing, or justification further supports due process violations. The abrupt invocation of a long-known California disbarment as a pretext for suspension—years after hire and post-litigation—evinces retaliatory motive.

---

### 1. Protected Activity

Dr. Phillips engaged in core constitutionally protected conduct. His filings in federal court, EEOC complaints, internal reports of governance violations, and public statements on grading integrity and financial mismanagement are the modern embodiment of the "uninhibited, robust, and wide-open" discourse the First Amendment was crafted to protect. See *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Academic institutions do not enjoy immunity from criticism, particularly when those criticisms address the integrity of educational standards, misuse of federal funds, and procedural malfeasance. That these critiques emerged not only in litigation but also in scholarly forums—such as university-wide emails to his fellow Professors—makes the protected nature of the speech irrefutable.

## 2. Adverse Employment Actions

The retaliatory cascade that followed was swift, chilling, and unlawful. Dr. Phillips was placed on involuntary administrative leave, removed from all teaching duties, blocked from university email systems, excluded from internal communications, and denied renewal of his academic contract. These are not mere inconveniences; they are textbook examples of adverse employment actions. The Eighth Circuit has long recognized that such retaliatory conduct—especially when tied to whistleblowing or protected litigation—is presumptively unlawful. See *Wagner v. Jones*, 664 F.3d 259, 269 (8th Cir. 2011).

These acts occurred not in a vacuum, but in close temporal proximity to Dr. Phillips' filing of his federal lawsuit and EEOC complaint. The leave letter of June 3, 2025 cited "grading decisions"—the very subject of the protected litigation—as grounds for suspension. This is not mere correlation; it is an institutional confession of retaliatory motive.

## 3. Causation

Temporal proximity alone often suffices to establish causation, particularly where—as here—retaliation follows within weeks of protected activity. See *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). But this case presents far more than timing: it reveals a carefully choreographed reprisal.

The June 3 letter invokes as justification a disbarment from the California State Bar—an issue fully disclosed to Lincoln University years earlier, repeatedly waived by both HR and the former Dean, and expressly cleared during ACBSP accreditation. To weaponize this ancient, irrelevant matter in direct response to protected speech—post-judgment—is to construct retaliation atop pretext atop institutional gaslighting. It is not the disbarment that changed; it is the University's

posture—suddenly hostile, suspicious, and punitive after being sued. That posture shift is the red thread of causation.

**Ongoing Constitutional Violation**

Unlike cases where a constitutional injury is complete, here the violation continues. Dr. Phillips remains on involuntary leave without notice, hearing, or due process. This is a live deprivation of liberty and property interests under the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565 (1975), makes clear that even temporary suspension requires rudimentary procedural protections.

Moreover, under Lincoln University's own Bylaws, only the Board of Curators may put a faculty member on a leave of absence. Yet no such vote occurred. President Moseley's June 5 email confirms the unilateral nature of the punishment. Such administrative overreach constitutes not only due process failure but ultra vires state action actionable under §1983.

**Separate and Independent Grounds: Whistleblower Protection and Institutional Estoppel**

Missouri's whistleblower protections under § 105.055 RSMo and common law doctrine further reinforce the likelihood of success. Dr. Phillips made good-faith disclosures concerning financial improprieties and was punished for doing so. Additionally, the university's longstanding tolerance of the disbarment—and its repeated use of Dr. Phillips' legal expertise—estops it from now asserting that same fact as a ground for termination. This is a form of institutional bad faith that undermines every claim of legitimate justification.

**Conclusion to I**

The facts are not disputed; they are damning. Protected conduct. Retaliatory action. Post-hoc rationalization. Ongoing constitutional injury. Dr. Phillips has not only a likelihood—but a compelling inevitability—of success on the merits. The Court need not search for smoke; the administrative arson is plain.

## II. IRREPARABLE HARM

The harm inflicted upon Dr. Phillips is not only irreparable—it is archetypal. It strikes at the soul of what the academy represents: a haven for independent inquiry, protected speech, and scholarly

dignity. Federal courts have long held that the loss of First Amendment freedoms—even for a brief period—constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, that deprivation is neither brief nor benign. It is active, ongoing, and intensifying.

Dr. Phillips' enforced administrative exile has severed him from the instruments of his profession:

- He has been stripped of his teaching responsibilities, dislodged mid-course from the students he mentored, leaving a pedagogical vacuum.
- His university email account was summarily terminated, cutting off access to national academic networks, research collaboration, and confidential communication with students and colleagues.
- He is blocked from Canvas, Cengage, and other educational platforms necessary to uphold his teaching, assessment, and grading duties.
- His name has been besmirched by insinuations of misconduct, insubordination, and credential deficiency—all discredited by prior institutional knowledge, HR clearance, and accreditation vetting.

Reputation is the lifeblood of academic life. In a community that evaluates scholars not by quarterly earnings but by the integrity of their thought and the continuity of their teaching, public suspicion—once cast—rarely fades. Unlike typical employment cases, the university setting amplifies reputational damage through permanence: hiring committees, editorial boards, and accreditation panels often rely on whisper networks more than résumés. Once defamed, a scholar's credibility is not easily restored.

Further, the psychological and spiritual toll of being exiled from one's vocation cannot be overstated. Dr. Phillips is not merely de facto unemployed—he is silenced. Denied his classroom, stripped of his institutional voice, and excluded from the community of scholars to which he has contributed meaningfully through teaching and published research. This includes his recent peer-reviewed article in the *Journal of Economic Issues* (Feb. 2025), which examined the nature of political control over decentralized institutions—a metaphor, it turns out, for the very governance failures now weaponized against him.

This is not just injury—it is erasure.

The Eighth Circuit has consistently held that loss of professional status, exclusion from teaching duties, and disruption of academic collaboration constitute irreparable harm, particularly when

tethered to retaliatory motive. See *Wagner v. Jones*, 664 F.3d 259 (8th Cir. 2011); *Kroske v. U.S. Bank Corp.*, 432 F.3d 976 (9th Cir. 2005). Dr. Phillips' harms are not speculative—they are occurring now, every day he is locked out of his digital office, every week he remains absent from the classroom.

No retrospective remedy will suffice. No damages award can reconstruct the forfeited semester, revive lost student connections, or erase the taint of implied wrongdoing. What is needed—and what Rule 65 provides—is the only meaningful relief available: immediate reinstatement. Anything less allows retaliatory inertia to harden into de facto termination, nullifying the very protections the Constitution affords.

In the language of equity, the clock is ticking. With each passing day, the breach deepens—not just in Dr. Phillips' professional life, but in the constitutional guarantees that underpin academic governance. The Court must act now, not merely to preserve Dr. Phillips' rights, but to uphold the very principle that dissent within the academy is not a disciplinary offense—it is its lifeblood.

## III. BALANCE OF EQUITIES

Equity, at its core, weighs the morality of circumstance against the gravity of consequence. Here, the balance does not merely tip—it collapses entirely in Dr. Phillips' favor. Lincoln University has offered no credible justification for its punitive action. No investigation was conducted. No due process afforded. No policy breach identified beyond vague allegations recycled from long-resolved matters.

By contrast, Dr. Phillips stands at the precipice of professional ruin. Each day of exclusion extends the reach of a reputational injury that may soon become irreversible. This is not a typical employment dispute—it is the systemic silencing of a scholar for engaging in protected speech. Equity was designed for moments such as these.

To date, the University has not produced a single internal document, memorandum, or sworn account identifying actionable misconduct by Dr. Phillips. The allegations contained in the June 3, 2025 letter—"grading decisions," "insubordination," and "credential concerns"—are neither

new nor substantiated. They were not the product of investigation but the byproduct of retaliation. And they contradict all prior findings from Human Resources, university administration, and the ACBSP accreditation process.

The disbarment referenced in the leave notice is a red herring—a previously acknowledged and dismissed fact used opportunistically and maliciously after the filing of this lawsuit. Indeed, Dr. Phillips' credentials were specifically reviewed during the 2024 accreditation cycle, and no deficiency was found. To now repackage those same credentials as suddenly problematic— absent new evidence or intervening event—defies not only logic but equity.

Moreover, Defendants suffer no hardship by reinstating Dr. Phillips to the classroom. There is no claim of disruption, no threat to students, no concern regarding safety or competence. What is feared, if anything, is not misconduct—but this very same federal litigation. That is not a legally cognizable injury. See *Sampson v. Murray*, 415 U.S. 61, 91 n.68 (1974) (mere institutional discomfort is not irreparable harm). On the contrary, reinstatement with no further reprisal for the duration of the litigation in question restores the status quo ante, preserving both the pedagogical integrity of the institution and the constitutional rights of its faculty.

The longer Dr. Phillips remains on administrative leave, the more his voice is muted in a university that purports to champion critical inquiry. Meanwhile, the University is not asked to suffer anything beyond accountability. No monetary cost is imposed. No pedagogical compromise is required. He simply resumes the duties for which he was hired, qualified, and repeatedly evaluated as competent.

In fact, the equities tilt beyond the parties and toward the student body, who have been deprived of a dedicated professor mid-semester. The pedagogical disruption is theirs to bear, not the administration's. In a broader sense, the academic community itself suffers each time critical faculty are expelled under the veil of "internal discipline." Judicial indifference to such patterns invites institutional impunity.

Equity does not count costs—it weighs consequences. The only consequence facing Defendants is a temporary inconvenience. For Dr. Phillips, the consequence is professional exile. The

doctrine demands that where there is doubt, the law must err on the side of liberty. The Court should do so here and restore the equilibrium academic governance requires.

## IV. PUBLIC INTEREST

This case is no mere employment dispute—it is a referendum on the integrity of public higher education. At stake is the very soul of the university as a forum for dissent, a bastion of inquiry, and a steward of constitutional fidelity. The public interest here is not tangential—it is paramount.

The federal courts have long affirmed that the preservation of constitutional rights is itself a compelling public interest. *Planned Parenthood v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008). As the Supreme Court explained in *Gonzales v. O Centro Espirita*, 546 U.S. 418, 429 (2006), "the government's interest is diminished where the burdened activity is protected by the Constitution." That principle echoes through this case. It is not Dr. Phillips alone who suffers when protected speech is punished—it is every faculty member, student, and stakeholder who believes the university is more than a bureaucracy.

Lincoln University is a public institution, bound not only by its own bylaws but by the constitutional scaffolding that undergirds every land-grant university's federal charter. When administrators sideline tenured-track associate professors without cause, when they retaliate against whistleblowing faculty, and when they erase academic voices without due process, the ripple effects are seismic. They undermine:

- Transparent faculty governance, a cornerstone of institutional legitimacy;
- Protection of whistleblowers, as required under Missouri law and federal funding conditions;
- The sanctity of student grades, which are not administrative playthings but protected evaluations governed by academic standards;
- Federal compliance, particularly with Title IV obligations mandating institutional accountability and fair process in governance.

In this context, the public interest is not theoretical. It is practical, legal, and urgent. Lincoln University receives millions in federal funds premised on compliance with nondiscrimination,

transparency, and due process. Silencing a professor for exposing financial irregularities or contesting unlawful grading overrides subverts not only institutional norms, but statutory obligations tied to Title III and IV funding.

Moreover, the message sent by unchecked retaliation is corrosive: that silence is safer than integrity, that conformity is rewarded and truth punished. That is the antithesis of what a public university is meant to represent. The First Amendment was not designed to comfort the comfortable, but—as Justice Brennan reminded us—to protect those who dare to "expose their ideas to the testing of public discourse."

The Court's intervention serves not merely Dr. Phillips, but the public's stake in academic freedom, faculty governance, and institutional integrity. An injunction restores that balance, reminding public universities that they operate not above the Constitution—but under it.

## V. VOID ACTIONS FOR LACK OF AUTHORITY

The administrative leave imposed on Dr. Phillips is not merely unlawful in substance—it is void ab initio. Under Lincoln University's Bylaws, the authority to place a faculty member on leave rests solely with the Board of Curators. The June 3, 2025 letter was issued by Provost Dr. Stevie Lawrence without such Board authorization. There was no resolution. No recorded vote. No deliberative session. No entry in the public record of the Board's minutes. The administrative action, therefore, was ultra vires and must be declared a legal nullity.

In the realm of public institutions, governance rules are not aspirational—they are jurisdictional. When administrators exceed their authority under the governing bylaws of a university, they do not merely err—they act without legal force. The Eighth Circuit has long recognized that actions taken by public officials outside the scope of their delegated authority are not only voidable, but void. See *United States v. Poulsen*, 41 F.4th 1047, 1054 (8th Cir. 2022) ("When an official acts beyond the limits of conferred authority, that act is void and unenforceable.").

Equity intervenes precisely to prevent this kind of institutional abuse. It is not simply a matter of bureaucratic misstep. The bypassing of the Board of Curators subverts the core procedural protections embedded in university governance and due process itself. What Dr. Lawrence executed on June 3, 2025 was not an administrative leave authorized by a duly constituted body; it was an autocratic edict cloaked in institutional letterhead.

Moreover, Lincoln University cannot invoke internal procedure to shield this act. The doctrine of apparent authority does not apply where express provisions limit discretion. Bylaws are binding covenants—analogous to legislative charters—and actions taken in direct contravention of them must be vacated. Courts have not hesitated to invalidate university actions undertaken without requisite board approval. See *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) ("The absence of delegated authority is fatal to the legitimacy of administrative action.").

Nor may the university seek refuge in ex post ratification. There is no evidence that the Board of Curators has met, ratified, or even reviewed Dr. Lawrence's June 3 directive. Silence is not consent, and acquiescence does not cure illegality. This is especially true where the consequence of that action is the silencing and exclusion of a tenured faculty member engaged in protected activity.

In this regard, the case transcends individual harm. It implicates a broader question of institutional legitimacy: Can a university sidestep its own governance rules to punish dissent? Can an administrator seize powers expressly reserved for the governing board in retaliation for federal litigation? The law resoundingly answers no. Equity must answer likewise.

The June 3 administrative leave letter is void, not voidable. The Court must not lend the imprimatur of judicial legitimacy to what is, in substance and form, an act undertaken in clear excess of legal authority. To do so would not only embolden future misconduct—it would erode the very scaffolding of rule-based university governance. The injunction must issue to restore legality to institutional action and to reaffirm that no public official—however high in title—may act beyond the limits of law.

## VI. PRIOR RESTRAINT AND THE CHILLING EFFECT ON ACADEMIC SPEECH

Even apart from the classic *Mt. Healthy* retaliation framework, the suspension of Dr. Phillips and the denial of his email and instructional access constitute an impermissible **prior restraint** on constitutionally protected speech.

The United States Supreme Court has consistently treated prior restraints as the gravest form of First Amendment violation. As stated in *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976):

"Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."

This doctrine dates back nearly a century to *Near v. Minnesota*, 283 U.S. 697, 713 (1931), where the Court held that any attempt by government actors to preemptively suppress speech—especially without due process—demands the most exacting scrutiny.

Here, Lincoln University has not merely punished speech after the fact, but has actively *precluded* Plaintiff from engaging in the very conduct the First Amendment was designed to protect:

- Teaching students;
- Commenting on matters of public concern (i.e., faculty governance and grading);
- Collaborating with colleagues;
- Publishing research;
- Accessing archives and digital platforms necessary for academic expression.

This administrative silencing amounts to a *de facto* gag order, issued without hearing, vote, or opportunity for defense. The effect is to freeze not only the Plaintiff's voice but also the broader speech ecosystem of the institution itself.

As the Supreme Court explained in *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967):

"The classroom is peculiarly the 'marketplace of ideas.' The First Amendment does not tolerate laws that cast a pall of orthodoxy over the classroom."

This case does not involve mere employment dispute; it concerns the muzzling of a faculty voice in the core constitutional space of a public university. When a professor is suspended for engaging in scholarship and advocacy critical of the institution's failures—failures now confirmed by accreditation irregularities and federal funding noncompliance—such action is not merely retaliatory. It is **preventive censorship**, and as such, **must fail as a matter of law**.

The chilling effect is not speculative. The retaliatory message to faculty is loud and clear: Speak out, and you risk the same fate. That alone justifies immediate injunctive relief.

**A. Faculty Governance Precedent**

Since the 1915 Declaration of Principles on Academic Freedom by the American Association of University Professors (AAUP), faculty governance has stood as a constitutional bulwark against administrative overreach. Public universities are not hierarchical corporations—they are public trusts, governed by principles of shared governance, institutional accountability, and academic freedom. That architecture is not optional. It is constitutional.

In *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014), the Ninth Circuit held that even internal faculty writings about governance are protected speech under the First Amendment. The Court declared:

"Teaching and academic writing are at the core of a public university professor's official duties, and restrictions imposed on such speech require a particularly strong showing of institutional justification."

The retaliation here targeted exactly that—Dr. Phillips' speech on how grades were overridden, federal funds misused, and due process circumvented. His case thus represents the precise evil academic freedom was designed to forestall.

This Court need not look far for historical parallels. In *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), Justice Frankfurter warned:

"A free society depends on free universities. Academic freedom is essential to our survival as a nation."

The retaliatory actions against Dr. Phillips defy this constitutional lineage. The administrative invocation of "grading concerns" as a pretext to silence political and scholarly dissent is not merely unlawful—it is **un-American**.

## VII. ADMINISTRATIVE POWER VERSUS CONSTITUTIONAL ORDER

Public universities are not cloisters of conformity nor monasteries of censorship. They are temples of democratic discourse, where ideas—however inconvenient to power—must be allowed to breathe. The First Amendment does not draw its force from convenience or compliance. It derives its power precisely because it protects the unpopular, the disruptive, the dissenting. In that spirit, the retaliatory administrative leave imposed on Dr. Phillips is not merely a bureaucratic abuse—it is a constitutional injury rendered behind closed doors, in the fashion of a modern-day Star Chamber.

Dr. Phillips' situation is not an aberration; his narrative is a cautionary tale. The absence of process, the invocation of pretext, the sudden severance from students, research, and colleagues—these are not the tools of lawful governance. They are the hallmarks of institutional fear masquerading as policy. When governance is wielded as a weapon, justice demands not deference, but stark intervention.

This Court's role transcends formality. It is not confined to determining whether Lincoln University followed its own internal script. Rather, it must ask whether that script was itself used to mask retaliation, whether process became pretext, and whether power displaced principle.

The judiciary stands as the final safeguard when the architecture of internal regulation collapses under the weight of institutional self-interest. The Constitution's protections are not optional clauses, to be suspended when administrators feel discomforted by transparency or whistleblowing. They are the very foundation upon which public universities rest their legitimacy.

To restore Dr. Phillips is not simply to reverse a wrongful leave—it is to reaffirm that constitutional order outranks administrative whim. It is to declare that the rights of professors do not end where the insecurities of bureaucrats begin.

Justice Holmes once wrote, "The best test of truth is the power of the thought to get itself accepted in the competition of the market." That market—the marketplace of ideas—exists most crucially in our universities. But when those ideas are punished without process, the market collapses. It becomes a monopoly of silence.

This Court's injunction would not only restore one professor. It would restore the scaffolding of constitutional accountability to an institution that momentarily forgot what it was built to defend. In doing so, the Court would signal that no administrative office—however exalted—can supersede the law, and that no act of public retaliation can stand unchallenged when it attempts to eclipse the First Amendment under the shadow of institutional secrecy.

## VIII. REINSTATEMENT IS AN APPROPRIATE AND WELL-ESTABLISHED REMEDY

Federal courts have consistently recognized reinstatement as a proper remedy where public employees—particularly educators—have been subjected to unconstitutional retaliation.

In *Skehan v. Bd. of Trustees of Bloomsburg State College*, 590 F.2d 470 (3d Cir. 1978), the court reinstated a professor who had been terminated in violation of due process, finding that equitable relief was warranted given the constitutional dimensions and reputational harm.

Similarly, in *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. 1995), the Second Circuit held that retaliatory actions taken by university officials against a professor for protected speech demanded equitable remedies including reinstatement **and the cessation of retaliatory conduct**.

Most significantly, in *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979), the U.S. Supreme Court reaffirmed that a public school teacher's private expressions of concern to a school principal were protected speech, and any retaliatory dismissal based on such expression violated the First Amendment.

These precedents confirm that where public educators are targeted for protected speech, reinstatement is not only permissible—it is often the most just and necessary remedy to restore constitutional balance. Plaintiff's case aligns precisely with this jurisprudence: a retaliatory leave imposed without due process, and in direct response to protected litigation and faculty speech.

The requested injunction would return Dr. Phillips to the status quo ante and preserve the constitutional status of faculty autonomy during litigation.

### 1. Plaintiff's Standing as a Scholarly Contributor

Dr. Phillips is not a marginal adjunct but a recognized academic contributor nearing tenure status. In the past twelve months alone, he has published in premier journals including the *Journal of Economic Issues* (2025) and the *Cambridge Journal of Economics* (2024), covering topics in political economy and depoliticized monetary theory. These achievements—formally credited to Lincoln University—demonstrate both the magnitude of professional disruption and the public institutional stake in restoring his pedagogical role.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, and in defense of not only the rights of one professor but the integrity of constitutional order itself, Plaintiff Dr. Emir James Phillips respectfully prays that this Honorable Court:

1. **Issue a Temporary Restraining Order and Preliminary Injunction** compelling Lincoln University to immediately reinstate Plaintiff to his full faculty duties, including the right to teach, research, correspond with students and colleagues, and participate in university governance;

2. **Restore Plaintiff's access to all institutional platforms** including university email, research databases, student management systems (Canvas), and any other digital infrastructure essential for the exercise of his academic duties and intellectual contributions;

3. **Enjoin Defendants from taking any further retaliatory actions** against Plaintiff—including but not limited to further leave impositions, contract non-renewals, defamatory communications, or credential-based pretextual attacks—during the pendency of this litigation which shall include all utilized procedures pertaining to appellate and post-judgment avenues of relief;

4. **Set a prompt evidentiary hearing** to resolve the merits of this injunctive relief and allow full development of the factual record, including testimony from university officials, faculty peers, accreditation bodies, and affected students;

5. **Award such further legal, declaratory, or equitable relief** as this Court may deem just and proper, including attorneys' fees and costs under 42 U.S.C. § 1988, if applicable.

This case presents not only a breach of contractual and constitutional duty, but a crisis in the stewardship of public education. If public universities are permitted to silence dissent through procedural artifice, the spirit of academic freedom will erode into mere performance. Plaintiff therefore seeks relief not simply to vindicate his own rights, but to preserve the rule of law in an institution entrusted with nurturing the next generation of democratic citizens.

Respectfully submitted,

*emir phillips*

**Dr. Emir James Phillips**
Pro Se Plaintiff
806 Chancery Lane
Cave Springs, AR 72718
(310) 930-6360
emirphil@yahoo.com

**AFFIDAVIT OF DR. EMIR JAMES PHILLIPS IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Dr. Emir James Phillips, being duly sworn, hereby declare and affirm under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

1. **Professional Background**: I am a tenured professor of finance at Lincoln University, a public institution in Jefferson City, Missouri. I hold a Juris Doctor, an MBA, and a Ph.D. in Economics. I have published extensively on matters of financial regulation, public accountability, and the intersection of economic governance and law, including a recent article titled "Will Bitcoin Incarnate Satoshi Nakamoto's Vision of Depoliticized Money?" in the *Journal of Economic Issues* (Feb. 27, 2025).

2. **Scholarly Contributions**: I have consistently published in peer-reviewed journals and contributed to the academic reputation of Lincoln University. I have served on faculty committees, mentored students, developed online curriculum, and represented the university in multiple professional forums and committees.

3. **Protected Activities**: I filed a Verified First Amended Complaint on May 1, 2025, in the United States District Court for the Western District of Missouri, alleging violations of my constitutional rights and federal statutes as well as financial mismanagement within Lincoln University. I also filed related EEOC complaints in 2024 and 2025, asserting First Amendment retaliation, racial discrimination, and governance-related violations.

4. **Retaliatory Conduct**: On June 3, 2025, I was placed on involuntary paid administrative leave via letter from Provost Dr. Stevie Lawrence. The letter cited "grading decisions," "insubordination," and "credential concerns" as justification—issues either fully known to the university at the time of my hire or already the subject of my pending federal litigation.

5. **Procedural Violations**: No hearing was held. No Board of Curators vote or authorization occurred. No formal investigation was conducted, and no evidence was ever presented to support the vague accusations in the June 3 letter. This suspension was executed solely by Provost Lawrence, without jurisdiction or due process.

6. **Pretextual Disbarment Reference**: The leave letter referenced my California disbarment, a matter disclosed at the time of my hire and deemed irrelevant by HR and

academic leadership. Former Dean Dr. Natalie Mikhaylov was aware of my disbarment in 2023 and still asked me to teach Business Law, affirming that my JD, seven years of law firm experience, and successful teaching record made me fully qualified. The disbarment had no bearing on accreditation, per 2024 ACBSP review records.

7. **Ongoing Harm**: I have been denied access to university email, my online teaching platform, student records, research materials, and institutional data. I have been unable to fulfill teaching duties, attend academic meetings, or correspond with students or peers. My professional reputation has suffered substantial damage, and the stigmatization of my status has generated confusion among students, colleagues, and prospective collaborators.

8. **Lack of Alternative Remedies**: Monetary damages cannot repair the present harm. My scholarly identity, academic autonomy, and constitutional rights continue to be chilled daily by an unlawful leave action that violates not only my contract, but also my First and Fourteenth Amendment rights.

9. **Request for Judicial Relief**: I respectfully ask this Court to grant a Temporary Restraining Order and Preliminary Injunction to reinstate me to full faculty status, restore access to institutional platforms, and enjoin further retaliatory conduct during the pendency of this action. Without such relief, the damage to my career and constitutional rights will be irrevocable.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of June, 2025, in Santa Monica, California.

*emir phillips*

Dr. Emir James Phillips
Plaintiff, In Propria Persona

**CERTIFICATE OF SERVICE**

27

I hereby certify that on May 30, 2025, the foregoing was filed electronically via the Court's electronic filing system and was served by operation of the CM-ECF system on all counsel of record.

*emir phillips*

Emir Phillips